

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |
|---|---|
| MICHAEL GASPARI,<br><br>        Plaintiff,<br>    v.<br><br>Michael J. Astrue[1],<br>Commissioner of Social<br>Security<br>        Defendant. | ) <br> ) <br> ) <br> )   Case. No. 06-CV-5292 <br> ) <br> )   Magistrate Judge <br> )   Arlander Keys <br> ) <br> ) <br> ) |

### MEMORANDUM OPINION AND ORDER

Plaintiff, Michael Gaspari, moves this court for Summary
Judgment, pursuant to Rule 56(a) of the Federal Rules of Civil
Procedure, to reverse or remand the final decision of the
Commissioner of Social Security (the "Commissioner"), who denied
his claim for Supplemental Security Income ("SSI") and Disability
Insurance Benefits ("DIB"). 42 U.S.C. § 401 et seq. (West
2007). Defendant Commissioner has filed a Cross-Motion for
Summary Judgment. For the reasons set forth below, the Court
grants Plaintiff's Motion for Summary Judgment, denies the
Commissioner's Cross-Motion for Summary Judgment, and remands the
matter back to the Commissioner for further proceedings
consistent with this Opinion.

---

[1] On February 12, 2007, Michael J. Astrue took over as the new Commissioner of
the Social Security Administration. His name has been substituted in for that
of Jo Anne B. Barnhart, who served in that capacity when this case was filed
and whose name appeared on the original complaint.

## FACTS AND PROCEDURAL HISTORY

Michael Gaspari applied for SSI and DIB on April 7, 2003, claiming that he had been disabled since February 8, 2003. Record at 276. Mr. Gaspari claimed that he was disabled because he suffered from diabetes, hypertension, depression, and panic attacks. R. at 44. The SSA denied Mr. Gaspari's claim initially on June 4, 2003, and again upon reconsideration on November 30, 2004. R. at 40-44, 53-56. Mr. Gaspari subsequently requested a hearing before an Administrative Law Judge ("ALJ"), who held the requested hearing on September 23, 2005. R. at 58, 294.

The ALJ's February 13, 2006 decision denying Mr. Gaspari benefits became the final agency decision when the Appeals Council denied review on August 23, 2006. R. at 6-9; see 20 C.F.R. § 416.1481. Mr. Gaspari then filed this lawsuit on September 28, 2006, seeking review of the agency's decision and an award of benefits. Compl. ¶ 1. The case was initially assigned to Judge Milton Shadur; when the parties subsequently consented to proceed before a magistrate judge, the case was reassigned to this Court on December 18, 2006. Thereafter, both parties moved for summary judgment. Mr. Gaspari asks the court to reverse the ALJ's decision and award benefits, or, in the alternative, remand the case for further proceedings. The Commissioner has filed a cross-motion for summary judgment.

2

## TESTIMONY AT THE HEARING

### A. Testimony of Plaintiff Michael Gaspari

The ALJ first heard testimony from Mr. Gaspari. Mr. Gaspari testified that he is 5' 8" tall and weighs 256 pounds, and that he was previously married. R. at 325, 331. Mr. Gaspari currently lives with his parents, who provide him with financial assistance. R. at 301, 326.

With respect to his daily activities, Mr. Gaspari testified that he has physical difficulty doing chores, due to back pain. R. at 302. Mr. Gaspari stated, "It seems I have more rest periods than I have work periods." R. at 304. Mr. Gaspari testified that he can walk only one block before he becomes "totally fatigued and short of breath." R. at 314. Mr. Gaspari can sit for a period of about four to six hours, but then he needs to get up and move around. R. at 320. Similarly, he can stand for approximately two to three hours before needing to rest. R. at 315. Mr. Gaspari testified that he can lift a gallon of milk, and can probably lift up to ten pounds, though with difficulty, and that carrying more than ten pounds "would be a little bit more difficult." R. at 330-31.

With respect to physical impairments, Mr. Gaspari testified that he suffers from diabetes and that, as a result, his sugar levels fluctuate. R. at 310. Mr. Gaspari testified that, when his sugar levels are high, he "experience[s] high anxiety,

3

jitteriness, [and] compulsiveness," and he takes Klonopin to "bring down that level of heightened anxiety or jitteriness." R. at 311. When he experienced high sugar levels at work, he would be able to complete a task, but he would not necessarily be able to complete the task correctly. R. at 311-12. Mr. Gaspari testified that these episodes of high sugar levels last approximately thirty to sixty minutes, and occur approximately once every three to four weeks. R. at 312.

Likewise, Mr. Gaspari testified that he suffers from low sugar levels approximately once or twice per month, with each episode lasting at least ten to fifteen minutes. R. at 314. During periods of low sugar, he sweats profusely, shakes, stutters, experiences blurred vision, and loses control and focus. R. at 313. Mr. Gaspari testified that he brings his sugar levels back up by taking Glocotabs, which are, essentially, tablets of pure sugar. *Id.* Also, Mr. Gaspari testified that he would need to take a ten to fifteen minute break to get himself back on task, during which he would eat a snack or a candy bar, so that his "mental capacity and [his] blood sugars would be equal." R. at 314. Mr. Gaspari testified that he was treating his diabetes with insulin pump therapy, but that his sugar levels continued to fluctuate. R. at 310, 334-35.

Mr. Gaspari testified to a number of other health concerns, as well. He testified that he suffers from degenerative disc

4

disease, which causes back pain when he engages in certain types
of movement or lifting. R. at 303. In addition, he takes
"Osoflex" for his "ortho-arthritic [sic] knee," and also takes
Lasix. R. at 334-35. Furthermore, he was diagnosed with
Guillain-Barré syndrome ("GBS")[2] over ten years ago, which caused
him to be paralyzed for approximately six weeks.[3] R. at 305-06,
336. Mr. Gaspari testified that the GBS has left him with
neuropathy, which causes a delayed reflex in his lower
extremities and an occasional tingling sensation in his hands.
R. at 306-08.

   With respect to mental impairments, Mr. Gaspari testified
that he first suffered from depression and anxiety when he was
temporarily paralyzed from GBS. R. at 306. Additionally, Mr.
Gaspari suffers from panic attacks. R. at 315. Mr. Gaspari
testified that he is more likely to have panic attacks in
"stressful situations," that they occur approximately every three
to four weeks, and that he is likely to have a panic attack due

---

[2] Guillain-Barré Syndrome is "a disorder in which the body's immune system
attacks part of the peripheral nervous system. The first symptoms of this
disorder include varying degrees of weakness or tingling sensations in the
legs. . . . These symptoms can increase in intensity until certain muscles
cannot be used at all and the patient is almost totally paralyzed. . . . Most
patients, however, recover from even the most severe cases of Guillain-Barré
syndrome, although some continue to have a certain degree of weakness."
Guillain-Barré Syndrome Fact Sheet: National Institute of Neurological
Disorders and Stroke, *available at*
http://www.ninds.nih.gov/disorders/gbs/detail_gbs.htm (last visited December
4, 2007).
[3] Mr. Gaspari initially testified that he was "paralyzed for approximately six
weeks to a year." R. at 306. Dr. Ezike later asked Mr. Gaspari to clarify
this statement, at which time Mr. Gaspari testified, "The original onset I was
paralyzed for six weeks." R. at 335-36.

5

to his physical condition for instance, if his sugar drops, if he gets sinusitis, or if he gets the flu. R. at 315-16. Mr. Gaspari testified that it takes him twice as long to get over a viral infection because his immune system "isn't like everybody else's" and because he is diabetic. R. at 316. Thus, when he gets a viral infection, it "sends me into a panic attack because I know that diabetics are more higher at risk for heart attack, and all these other problems that diabetes can cause, amputations, and healing processes. It takes me longer which puts me into a state of panic." R. at 316-17.

Mr. Gaspari testified that he is "fragile like glass" and often has to miss work because he does not have enough energy to do a full day's work, due to the medications he takes, his diabetes, "and the antibiotics." R. at 318-19. Mr. Gaspari testified that he needs to miss work approximately once every three to six months because he has an illness, such as an ear infection or sore throat, and that he usually needs to stay home for three to four days before the doctors allow him to go back to work. *Id.*

Mr. Gaspari also testified that he has difficulty concentrating, and that he had recently been diagnosed with Attention Deficit Disorder ("ADD"). R. at 320. He has to read a paragraph two or three times before he understands what he needs to do. *Id.* When the ALJ questioned Mr. Gaspari about his ADD

6

diagnosis, Mr. Gaspari testified that "[the psychologist told me] that . . . no offense, but they told me if I was in a room and I was going to take a bar exam . . . with a large amount of students within an allotted period of time, I would be under stress and I wouldn't be able to concentrate." R. at 331-32.

Mr. Gaspari testified that he takes the following medications: Parnate; Klonopin; Dolobid; insulin; "Osoflex"; Cozaar; Zetia; Lasix; and Tylenol and Mucinex for colds. R. at 334-35. Finally, Mr. Gaspari testified that his overall mental condition had remained the same since April of 2003. R. at 338.

Mr. Gaspari testified that he worked as a police officer for South Suburban College from 1996 to 1999, and that he had full police powers at this job. R. at 361. In other words, he was able to carry a firearm, could make arrests within a certain area around the campus, and would occasionally have to physically restrain people. *Id.* Mr. Gaspari testified that he had previously worked part-time as an armed security guard, for approximately thirty hours per week. R. at 361-62. When the ALJ asked Mr. Gaspari whether he was working in April of 2003, Mr. Gaspari testified that he was not working at that time, but was on disability from the Secretary of State's office, because they would not allow him to take breaks to give himself insulin or get a snack while at work. R. at 354. Mr. Gaspari previously worked as a public service representative for the Secretary of State's

office, beginning in August of 2000, where he completed application forms and processed driver's license applicants while sitting at a computer for eight hours. R. at 360-61. Mr. Gaspari also testified that he worked as a police officer for the City of Hometown from September of 2004 until February of 2005, working six hours per day, three days per week. R. at 362. Notably, while Mr. Gaspari was working as a police officer for Hometown, he was also receiving disability from the Secretary of State's office. *Id.*

When questioned by the ALJ, Mr. Gaspari testified that his earnings of approximately $5,100 in 2003 came from the Secretary of State's office, as he was on disability leave from his job as a public service representative. R. at 321. Then, when the ALJ asked Mr. Gaspari about his reported 2004 earnings of $8,000 from his job as a security guard and $2,000 from his job with the City of Hometown, Mr. Gaspari testified that this income came from both his earnings and the disbursements from the Secretary of State's office. R. at 321-22. The ALJ then asked Mr. Gaspari, "Am I correct, you did not work at all in 2003 and 2004?" to which Mr. Gaspari replied, "That's correct." *Id.* Then, the ALJ asked, "You did not work at all, part-time, or anything. Is that correct?" to which Mr. Gaspari responded, "Well, 2003 I don't believe I worked . . . at all. I think it was just disbursements from the . . . Secretary of State." R. at 322. Finally, the ALJ

asked, "Did you work at all in 2004?" to which Mr. Gaspari replied, "Yeah. I was a part-time police officer and I worked [as a security guard]." R. at 323.

The ALJ then asked Mr. Gaspari whether he had ever received unemployment compensation. R. at 326. Mr. Gaspari testified that he filed for unemployment in either February of 2004 or 2005, when he was asked to resign from the City of Hometown. R. at 326-27. Mr. Gaspari stated that he believed the City asked him to resign because he was diabetic. *Id.* Mr. Gaspari testified that, although he filed for unemployment compensation, he was denied this compensation because "they said that I willingly resigned from the police department." R. at 327. The ALJ then stated, "Now, they ask you a question when you file for unemployment compensation and that is whether you believe you can work full-time. Are you physically and mentally able to work full time? Are you available for full-time work? Can you work full time? How did you answer those questions?" R. at 328. In response, Mr. Gaspari testified, "I answered those questions, I'm available for full-time. I don't know if I can handle a full-time job and employment. It would have to be done dependent on what type of job I was offered." *Id.* The ALJ then clarified Mr. Gaspari's response, asking him, "Yeah, but you answered that question that you were available for full-time work. Is that correct?" to which Mr. Gaspari replied, "Right." *Id.*

9

Finally, the ALJ asked Mr. Gaspari to elaborate on the attendance problems he had with his past work. R. at 329. Mr. Gaspari testified that, hypothetically, he would have to call in sick at least two or three times per month if he were at a full-time job. R. at 329-30. Additionally, Mr. Gaspari testified that, in an eight-hour shift, he would need to take approximately two or three unscheduled breaks—in addition to the three standard scheduled breaks. R. at 330.

## B. Testimony of Mr. Thomas Grzesik--Vocational Expert

Mr. Thomas Grzesik, a vocational expert ("VE"), testified at the hearing. Mr. Grzesik testified that he would characterize Mr. Gaspari's job as a police officer as "skilled and very heavy in demand," and that this job would have transferable skills to an unarmed security guard position that was "light" in exertional level. R. at 363-65. Next, Mr. Grzesik testified that he would characterize Mr. Gaspari's job as a public service representative for the Secretary of State's office as "essentially a data entry position . . . semi-skilled and sedentary in physical demand." R. at 363. Mr. Grzesik explained that, since this "data entry position" is already sedentary, there would not be any exertional level below that. R. at 363-64. Mr. Grzesik characterized Mr. Gaspari's work as an armed security guard as a "semi-skilled occupation and very heavy in physical demand," for which there were no transferable skills. R. at 363. At this point, the ALJ

10

asked Mr. Grzesik whether his testimony thus far was "in accordance with the DOT,"[4] to which Mr. Grzesik replied in the affirmative. R. at 364.

The ALJ then asked Mr. Grzesik whether an individual would be able to do Mr. Gaspari's past relevant work if that individual: (1) was forty-one years old; (2) had graduated from college; (3) had Mr. Gaspari's past work experience; (4) could lift no more than ten pounds frequently or twenty pounds occasionally; (5) had no restrictions on sitting; (6) could stand for four to six hours with normal breaks; (7) was "moderately limited" in climbing stairs; and (8) could not climb ladders. R. at 365. Mr. Grzesik testified that, in his opinion, this hypothetical person would be able to do Mr. Gaspari's past job working as a "driver examiner and data entry clerk" for the Secretary of State's office. R. at 365-66.

The ALJ then asked Mr. Grzesik whether this individual would be able to do any of Mr. Gaspari's past relevant work if this individual also: (1) had no marked or extreme limitations of mental residual functional capacity; (2) was moderately limited in his ability to maintain attention and concentration for extended periods, to perform activities within a schedule, to maintain regular attendance, and to be punctual within customary

---

[4] Dictionary of Occupational Titles. The DOT is published by the Department of Labor, and gives detailed physical requirements for various jobs. The SSA has taken "administrative notice" of the DOT. *See* 20 C.F.R. § 416.996(d)(1); *Prochaska v. Barnhart*, 454 F.3d 731, 735 at n.1.

11

tolerances; (3) was moderately limited in his ability to work in coordination with, or proximity to, others without being distracted by them; and (4) was moderately limited in his ability to interact appropriately with the general public. R. at 366. Mr. Grzesik testified that, while such an individual would not be able to do any of Mr. Gaspari's past relevant work, he would be able to do other work in the national economy. *Id.* Mr. Grzesik explained that such an individual would be capable of doing the following jobs: (1) mechanical assembler, for which there are 5,000 jobs in the region; (2) electrical electronic assembler, for which there are 4,000 jobs in the region; and (3) hand packager, for which there are 6,500 jobs in the region. R. at 366-67.

When questioned by Mr. Gaspari's attorney, Mr. Grzesik testified that these are all unskilled positions. R. at 368. Mr. Grzesik further testified that the rate of acceptable unscheduled absenteeism for these positions would generally be between six and twelve days per year. *Id.* Mr. Grzesik admitted that an individual would be precluded from working in these positions if he had one or two unscheduled absences per month. R. at 369. Similarly, Mr. Grzesik testified that, if an individual had to take one fifteen-minute unscheduled break per week-in addition to the standard breaks—such a situation may be reasonably accommodated, but that it "would be close" and "would

12

be up to the employer." *Id.* Finally, Mr. Grzesik testified that, if an individual took two fifteen-minute unscheduled breaks per week, he would not be able to hold any of these positions. R. at 369-70.

In the alternative, the ALJ asked Mr. Grzesik whether the hypothetical individual described above would be able to do any of Mr. Gaspari's past relevant work, if the individual also: (1) had a "full range of sedentary" motion; (2) was able to walk occasionally in an eight hour day; (3) was able to stand for two to three hours during an eight hour day; (4) was limited in his ability "to handle and finger"; (5) was markedly limited in maintaining attention and concentration for extended periods; (6) was markedly limited in completing a normal workday and work week without interruptions from psychologically- and physically-based symptoms; and (7) was markedly limited in performing at a consistent pace without an unreasonable number and length of rest breaks. R. at 367-68. Mr. Grzesik testified that such an individual could not perform any of Mr. Gaspari's past relevant work or any jobs in the national economy. R. at 368.

## C. Testimony of Dr. Chuckwuemeka Ezike--Medical Expert

Dr. Chuckwuemeka Ezike, M.D., a board certified physician in internal and occupational medicine, testified at the hearing as a medical expert ("ME"). R. at 342. When questioned by the ALJ, Dr. Ezike testified that the impairments in the record that are

13

"demonstrable by medically acceptable clinical and laboratory
techniques" are "a history of hypertension, mild diabetes,
degenerative joint disease, and obesity," as well as a history of
GBS and some psychiatric impairments. R. at 344. Dr. Ezike
testified that he based this opinion on Dr. Rabinowitz's October
2004 report. *Id.* Dr. Ezike testified that he considered Listing
of Impairment[5] 4.03 for hypertension; 9.08 for diabetes; 11.00
and 11.04 for GBS; and 1.01 and 1.04 for degenerative joint
disease. R. at 344-45. Dr. Ezike further testified that, when
considered individually, none of the impairments met a "listed
impairment." R. at 345. Likewise, Dr. Ezike testified that,
when considered in combination, Mr. Gaspari's impairments do not
"have symptoms, signs, and laboratory findings that equal in
severity a listed impairment." *Id.*

Dr. Ezike then testified as to Mr. Gaspari's residual
functional capacity ("RFC"), basing his opinion on Mr. Gaspari's
testimony and the medical records in Mr. Gaspari's file at the
time of the hearing. *Id.* Dr. Ezike testified that Mr. Gaspari
should be able to lift twenty pounds occasionally and ten pounds
frequently; sit with no restrictions; and stand for three to four

---

[5] "The Listing of Impairments describes, for each major body system,
impairments that are considered severe enough to prevent a person from doing
any gainful activity (or in the case of children under age 18 applying for
SSI, cause marked and severe functional limitations)." Part III    Listing of
Impairments (Overview), *available at*
http://www.ssa.gov/disability/professionals/bluebook/listing-impairments.htm
(last accessed December 4, 2007).

14

hours without breaks or four to six hours with normal breaks.
*Id.* Dr. Ezike opined that Mr. Gaspari has a "moderate
limitation" on climbing stairs and ladders, due to Mr. Gaspari's
drowsiness from his medications, and also because of his
degenerative joint disease. R. at 345-46. Dr. Ezike testified
that, quantitatively, this "moderate limitation" would limit Mr.
Gaspari to climbing three to five stairs and three feet up a
ladder. R. at 346. Finally, Dr. Ezike testified that he may
place a mild limitation on Mr. Gaspari's operation of machinery,
and testified that this limitation would vary depending on how
drowsy Mr. Gaspari is and on the type of machinery itself. R. at
346-47.

Mr. Gaspari's attorney then questioned Dr. Ezike. R. at
348. Dr. Ezike testified that Mr. Gaspari's testimony about his
high and low blood sugar episodes was consistent with his
impairment. *Id.* Dr. Ezike also testified that it was possible
for an individual with fluctuating blood sugar levels to need to
take breaks during work to handle the accompanying symptoms of
the episode. *Id.* Likewise, Dr. Ezike testified that it was
possible that Mr. Gaspari's level of fatigue was consistent with
his impairments and medications, and that it was possible that
Mr. Gaspari's conditions would cause him to call in sick from
work. R. at 348-49.

## D. Testimony of Dr. David Biscardi--Psychological Expert

Dr. David Biscardi, Ph.D., a licensed psychologist, also testified at the hearing as a medical expert in psychology ("PE"). R. at 351. Dr. Biscardi first testified that Mr. Gaspari's diagnoses of obsessive-compulsive disorder ("OCD") and generalized anxiety disorder ("GAD"), as noted by Dr. Cullinane in the Psychiatric Report, would be subsumed under Listing 12.06. *Id.* However, Dr. Biscardi testified that Dr. Cullinane did not provide any signs or symptoms related to OCD, and provided very little related to GAD, in his Psychiatric Report. R. at 351-52. Overall, Dr. Biscardi opined that Dr. Cullinane's mental status exam of Mr. Gaspari was insufficient because, for instance, Dr. Cullinane did not complete the cognitive portion of the exam and, instead, merely stated that he thought Mr. Gaspari had a "fair ability to do these things." R. at 352. Thus, Dr. Biscardi testified that there were no objective findings with respect to Mr. Gaspari's cognitive abilities. R. at 353.

Dr. Biscardi testified that, in his opinion, Dr. Hovsepian's Psychological Report was incomplete. R. at 355. More specifically, Dr. Biscardi testified that, while Dr. Hovsepian performed a number of tests, it is important to conduct a mental status exam ("MSE") as part of a psychological evaluation. *Id.* Dr. Biscardi testified that a MSE "is used to corroborate, verify, [and] cross-validate certain responses." *Id.* For

16

instance, Dr. Biscardi testified that Dr. Hovsepian's ADD diagnosis "looks to be provided on the basis of [a] self-report instrument. . . . " *Id.* Since there was "no mental status data in this report," Dr. Biscardi testified that he "[had] some difficulty with the conclusions that are drawn." *Id.* Thus, Dr. Biscardi testified that he "put more credence in [Dr. Cullinane's] report . . . [which] can be verified by [Mr. Gaspari's] updated records." R. at 355-56. Based on these two reports, and Mr. Gaspari's testimony that his overall mental condition was unchanged since April of 2003, Dr. Biscardi testified that he was in agreement with the Mental RFC Assessment and Psychiatric Review Technique Form, both completed by Dr. Cochran for the State. R. at 355.

Mr. Gaspari's attorney then questioned Dr. Biscardi about whether he felt he would be better prepared to make an assessment of Mr. Gaspari's mental condition if an MSE had been conducted. R. at 356. In response, Dr. Biscardi testified that an MSE "would be important with regards to the degree to which we look at [Dr. Hovsepian's] report," because it appeared as though Dr. Hovsepian made conclusions based on self-report instruments instead of clear observations. *Id.* Dr. Biscardi then reiterated his previous statement, testifying that, based on his observation of Mr. Gaspari at the hearing that day "and his ability to respond to questioning, his ability to certainly concentrate and

maintain attention, concentration, persistence, and pursuing this interview," Dr. Cullinane's Psychological Report was "sufficient." R. at 357.

Next, Dr. Biscardi explained that "a marked limitation would be a limitation that would preclude that ability in a work setting. A moderate limitation would indicate there are some limits, but it doesn't preclude his ability to do that." R. at 358. Dr. Biscardi agreed with Dr. Cochran's Mental RFC Assessment—that Mr. Gaspari continues to be capable of simple, routine work activities in a competitive work setting. *Id.* Dr. Biscardi testified, however, that he would be "hesitant" to see Mr. Gaspari return to work as a police officer "based on this data." *Id.* In conclusion, Dr. Biscardi testified that "there are some limitations certainly imposed, but it doesn't preclude his ability to do certain tasks. . . . " *Id.*

## ASSESSMENT REPORTS REVIEWED BY THE ALJ

In addition to the testimony given at the hearing, the ALJ also reviewed a number of assessment reports completed by Mr. Gaspari and his mother, Mrs. Rina Gaspari.

### A. 2003 Work History Report

The record includes a Work History Report that Mr. Gaspari completed for the SSA in April of 2003 ("2003 WHR"). R. at 144.

18

On the 2003 WHR, Mr. Gaspari listed his employment history for the prior fifteen years. *Id.* Mr. Gaspari indicated that he worked as a board certified instructor at a technical school from September of 1991 through August of 1994, teaching students how to be security guards. R. at 144, 150. Mr. Gaspari next worked as a substitute teacher in catholic schools from August of 1994 through June of 1995, in which he worked eight hours per day, five days per week. R. at 144, 149. Then, from February of 1996 through July of 1996, Mr. Gaspari worked two hours per day, four days per week, as a security officer at a marketing company. R. at 148. In this capacity, Mr. Gaspari "ensure[d] the safety of the employees from angered public of telemarketers." [sic] *Id.* Mr. Gaspari subsequently worked as a campus police officer at a state junior college from July of 1996 through November of 1999. R. at 144, 147. During this time, Mr. Gaspari worked at least eight hours per day, at least three days per week. R. at 147. Mr. Gaspari then worked as a private investigator for a security company from August of 1999 through August of 2000, where he worked at least seven to ten hours per day, four or five days per week. R. at 144, 146.

Next, Mr. Gaspari worked as a public service representative for the Illinois Secretary of State, at least eight hours per day, five days per week. R. at 144-45. Mr. Gaspari indicated that he worked at this job from August of 2000 through April of

19

2003. R. at 144. Mr. Gaspari stated that, in this capacity, he carried seventy-five-pound boxes of license plates approximately 100 yards. R. at 145. He also indicated that he frequently lifted less than ten pounds, and that the heaviest weight he lifted at this job was fifty pounds.[6] *Id.* Finally, in the "Remarks" section of the 2003 WHR, Mr. Gaspari wrote: "The jobs that I had that best suited me were jobs which I supervised myself and paced myself to achieve objective of task within alotted [sic] time slot." R. at 151.

## B. 2003 Activities of Daily Living Questionnaire for Physical Impairments

The record shows that, in April of 2003, Mr. Gaspari completed an Activities of Daily Living Questionnaire for Physical Impairments ("2003 Physical Impairments Questionnaire") with the help of his mother. R. at 156-60. Here, Mr. Gaspari indicated, "Because of my diabetes I have trouble dressing myself tying my shoes - foot pain after 7 hrs." R. at 157. He also stated that he sometimes has back pain on long drives, and that engaging in several other types of tasks also gives him back pain, such as using stairs for public transportation, pushing himself up from the bath tub, and walking for long periods. R. at 158. Similarly, Mr. Gaspari noted that he awakens with

---

[6] His statement, that the heaviest weight he lifted at this job was 50 pounds, is inconsistent with his previous statement on this form (that he carried 75-pound boxes of license plates).

20

stiffness in his back, and uses a cane "if the pain is bad and my legs are weak." *Id.*

When asked if he can sit for at least 2 hours without having to get up and stand or walk, Mr. Gaspari responded, "I can't sit for 2 [hours] but any longer my back begins to stiffen and my legs become numb and I need to move." *Id.* Mr. Gaspari then stated that he does not often do chores—such as cleaning, making his bed, or doing laundry—but that if he does, it takes him about one hour because he has to rest, so as to not fatigue himself. R. at 159. He also indicated that he does not play sports or use exercise equipment because "the pain and discomfort is high." *Id.* He then indicated that he takes rest periods "after activities that are strenuous (long walk, run, jog). . . . " *Id.* Mr. Gaspari also stated that he washes and waxes his car, though it takes him between one and two days to do this each month, and that, while completing this task, his pain usually heightens after four to six hours with rest periods. *Id.* Finally, Mr. Gaspari indicated that he was paralyzed from GBS for "several years," and that his mother reminds him to take his medications everyday. R. at 160-61.

21

## C. 2003 Activities of Daily Living Questionnaire

Mr. Gaspari completed a general Activities of Daily Living Questionnaire in April of 2003 ("2003 ADL Questionnaire"). Mr. Gaspari indicated that he cleans, vacuums and dusts "1-2 times per month if I can." R. at 161. Mr. Gaspari indicated that he usually walks and drives a car. R. at 162. When subsequently asked, "Has this changed since the condition began?" Mr. Gaspari responded, "My ability to walk is becoming difficult to breath [sic]/panting, chest pain, attacks of fear-panic." *Id.*

Mr. Gaspari indicated, "Some days I am overwhelmed/depressed by medications and cry and become highly anxious and cannot control emotions." *Id.* He also stated that he does not sleep well, noting that, "I am very fearful. Anxious about hospitals since I've had bad experiences in psychic [sic] ward at Ingalls [Hospital], I was in a lock down ward. . . . " *Id.*

In terms of socialization, Mr. Gaspari stated in the 2003 ADL Questionnaire that he is impatient with doctors and "[receptionists] that are rude." *Id.* He also indicated that he becomes frightened in crowds, because he feels confined and would much rather be in small crowds where he can get to his insulin. *Id.* Likewise, he is afraid of people because he thinks they are looking at him "because something is wrong with me (i.e. pants zipper open) [or] because I have difficulty walking." R. at 163. He has outbursts of frustration after he is turned down for jobs;

22

he doesn't mind being criticized if he is told nicely; but, if "roughly told I become antagonistic, and cry, at least 2 times per month." *Id.*

Mr. Gaspari stated on the 2003 ADL Questionnaire that he drives often, but exhausts himself if he drives longer than nine hours, and that he can climb only ten stairs. *Id.* Finally, Mr. Gaspari indicated that he overspends, cannot pay bills, and makes duplicate payments. *Id.*

## D. Activities of Daily Living Questionnaire--Third Party

Mrs. Rina Gaspari, Mr. Gaspari's mother, completed an Activities of Daily Living Questionnaire (Third Party) about her son in April of 2003 ("Third Party ADL Questionnaire"). R. at 152-55. Here, Mrs. Gaspari indicated that she reminds her son to take his medications everyday. R. at 152. Mrs. Gaspari also stated that Mr. Gaspari is unable to do any chores. *Id.* She indicated that Mr. Gaspari usually walks and drives a car, and that he also rides his bike. R. at 153. In response to the question, "Has this changed since the condition began?" Mrs. Gaspari stated, "legs, pain, chest pain, back pain, breathing difficult, fear and panic, sugar low." *Id.* Mrs. Gaspari later noted that her son drives often. R. at 154. When asked to describe the activity and "how it has changed because of [the] condition," Mrs. Gaspari indicated that her son "drove quite

23

often but now he gets to [sic] tired and worrie[s] about his insulin." *Id.*

Mrs. Gaspari also stated that her son is depressed, cries, "can't cope with small problems," and is insecure and afraid. R. at 153. She said that Mr. Gaspari is afraid of hospitals and doctors, and that he worries about his test results. *Id.* Similarly, she stated that Mr. Gaspari is impatient with doctors and office personnel, along with "drinkers, smokers and people who try to degrade him." *Id.* Mrs. Gaspari stated that her son enjoys being with people of his own culture, but that he doesn't like crowds, because he panics when he thinks he cannot get to his insulin. *Id.* She stated that her son feels like people talk about him because of his size or his walk, and that they tease him "like some kind of freak or try to belittle him because he tries to do his job with speed and correctley [sic], he says, nobody cares." R. at 154. Mrs. Gaspari indicated that her son "gets angry when someone does some thing wrong and they blame him for it, (he is not a fighter) he gets depressed when he can't cope with it or can not change it." *Id.* Likewise, Mrs. Gaspari stated that people are jealous of her son's education and are always criticizing him. *Id.* Finally, Mrs. Gaspari indicated that, since her son overspends and uses his credit card too much, his father is now helping him manage his finances. *Id.*

24

Mrs. Gaspari's notes in the "additional comments" section of the Third Party ADL Questionnaire included a statement that Mr. Gaspari "can no longer . . . hold a job, because everybody says he is a[n] [insurance] risk." R. at 155.

## E. 2004 Activities of Daily Living Questionnaire

In August of 2004, a SSADD claims representative helped Mr. Gaspari complete another Activities of Daily Living Questionnaire ("2004 ADL Questionnaire"). R. at 173-78. Mr. Gaspari's statements on the 2004 ADL Questionnaire generally indicated that he had physical difficulty doing chores, specifically due to back and knee pain. R. at 173. On this form, Mr. Gaspari stated that his legs always tingle because of the diabetic neuropathy and, as a result, it is difficult to stand for long periods of time. *Id.* Similarly, Mr. Gaspari noted that he awakens with stiffness in his back, and uses a cane "if the pain is bad and my legs are weak." R. at 174. Mr. Gaspari also stated that he was "paralyzed for 5 years+"[7] and still has "residual [e]ffects from GBS." *Id.* He also stated that he does not have any problems concentrating or thinking, though he did say he was forgetful. *Id.* He subsequently said that he has problems forgetting to finish things he had started, but stated, "I think this is a result of the medication I am on." *Id.*

[7] Again, this statement is inconsistent with Mr. Gaspari's testimony that he was paralyzed for six weeks as a result of GBS. *See* R. at 336.

25

Mr. Gaspari further stated in the 2004 ADL Questionnaire that he does not sleep well because of the pain, and seldom gets to bed before 2 a.m. R. at 176. He said that he drives his car and rides his bike if it is a nice day, though he does not ride his bike as often as he used to, and if he is very groggy from his medications, his father will drive him. *Id.* Moreover, he indicated that the arthritis and pain in his back and knees keeps him from working out as much as he used to; he also stated that he "used to jog a half mile a day but can no longer." R. at 177.

Finally, on the 2004 ADL Questionnaire, Mr. Gaspari stated that he gets frustrated with his doctor "when he tells me I have 'old man's' disease and there is nothing they can do for me." R. at 176. Mr. Gaspari stated that he enjoys being with other people, does not feel afraid of people, and that he does not get upset when people tell him to do something or criticize him. R. at 176-77.

## E. 2004 Activities of Daily Living Questionnaire for Physical Impairments

An SSAD claims representative also helped Mr. Gaspari complete another Activities of Daily Living Questionnaire for Physical Impairments ("2004 Physical Impairments Questionnaire") in August of 2004. R. at 179-81. On this form, Mr. Gaspari stated that he can lift fifteen to twenty pounds and that he can climb two or three stairs without a problem, but that he has

26

difficulty going up and down five stairs, because his knees will give out and he will have to hold onto the railing. R. at 179-80. He also stated that he drives a car two or three times per week, though he will occasionally have pain in his back. R. at 180. A question on the form asked if he could sit for at least two hours without having to get up and stand or walk. *Id.* Mr. Gaspari's response to this question was, "No – I can sit for about 1 hour before I have to stand and move about." *Id.* Mr. Gaspari then stated that he can walk for about thirty minutes before he needs to sit, and, if he was shopping, he would leave if the check-out line was too long. *Id.*

Mr. Gaspari also stated on this form that he does not wash his car, play sports, or use exercise equipment. R. at 181. He indicated that he used to jog, lift weights, bicycle, golf, bowl, and play tennis, racquetball and baseball; however, he can no longer do any of these activities, because of his back and knee pain. *Id.*

## F. Disability Report

In the Disability Report that Mr. Gaspari completed with his SSI and DIB application on April 7, 2003, he indicated that he stopped working on February 8, 2003. R. at 135. Additionally, he stated that he takes Parnate and Klonopin, as well as Lasix for weight control, and that all three medications cause him to experience drowsiness. R. at 140. He also noted that he takes

27

insulin for diabetes, and listed the side effects that he experienced from the insulin as "appetite." *Id.* Mr. Gaspari indicated that Dr. Baldwin was the physician who had prescribed him insulin. *Id.* Finally, Mr. Gaspari stated that he had completed "4 or more" years of college on January 2, 1989. R. at 141.

## G. Undated SSA Form

The record shows that Mr. Gaspari indicated on an undated exhibit, which appears to have been received at the hearing ("Undated SSA Form"), that he takes "Ostiflex"—a nonprescription medication—for "orthoarthritic [sic] (knees) bone density $L_1$ $L_2$ $L_3$ lumbar back (disc degeneration)." R. at 182. On this form, Mr. Gaspari stated that he worked at the Secretary of State's office from August of 2000 until October of 2003. R. at 183. Mr. Gaspari also provided additional information on his work background, indicating that he had worked as an armed security guard from October of 2003 to "present." *Id.* Finally, Mr. Gaspari indicated that Dr. Patel was the physician who prescribed him insulin, and that she first prescribed it on February 5, 2002. R. at 182.

## MEDICAL EVIDENCE

In addition to hearing testimony from Mr. Gaspari, the ME, the PE, and the VE, the ALJ considered a variety of medical records. The Court will discuss these records in full.

28

## A. DR. PATEL: MARCH 31, 2003

Mr. Gaspari indicated on the Disability Report that he first saw Dr. Mahendra Patel in February of 1989 for "flu, hepatitis shot, difficult breathing, walking pneumonia [sic]." R. at 137. However, the only information in the record from Dr. Patel is a form sent from the State Employees' Retirement System in March of 2003. R. at 198. On this form, Dr. Patel noted that Mr. Gaspari's diagnosed conditions were: uncontrolled, insulin-dependent diabetes mellitus; panic attacks; depression; anxiety neurosis; chest pains; shortness of breath; and diabetic neuropathy. *Id.* Dr. Patel also indicated that the "objective symptoms and findings" were: reduced pain and touch sensations; anxiousness; and depression. *Id.* Attached to the form completed by Dr. Patel was the first page of Mr. Gaspari's DIB application form, in which he had described the "illness that caused disability" as "IDDM [insulin-dependent diabetes mellitus], panic attacks, depression, chest pains, shortness of breath." R. at 199. Finally, Dr. Patel indicated that Mr. Gaspari would be medically unable to work for an indefinite period of time, and that his estimated return-to-work date was "indefinite (never)." R. at 198.

## B. DR. BALDWIN: APRIL 23, 2003

On April 23, 2003, Dr. David Baldwin completed a Diabetic Report form for the Bureau of Disability Determination Services.

29

R. at 197. On this Report, Dr. Baldwin indicated that he had most recently examined Mr. Gaspari on December 19, 2002. *Id.* Dr. Baldwin also stated that Mr. Gaspari did not have any visual or retinal complications, vascular complications, or neuropathy. *Id.* Finally, in response to the section of the form that asked him to "[d]escribe the patient's ability to do work-related activities such as sitting, standing, moving about, . . . " Dr. Baldwin wrote "normal." *Id.*

## C. DR. CALDARELLI: OCTOBER 1998 TO NOVEMBER 2002

The record shows that Dr. David Caldarelli began treating Mr. Gaspari after Mr. Gaspari was referred to him by Dr. Baldwin. R. at 194. Dr. Caldarelli's treatment notes indicate that, when he first saw Mr. Gaspari on October 15, 1998, Mr. Gaspari had been having recurrent, painful ear infections for approximately one year. *Id.* On that date, Dr. Caldarelli also indicated that Mr. Gaspari "is a diabetic on regular and NPH Insulin and he also takes Klonopin, Parnate, Chlorohydrate and Prilosec." *Id.* Mr. Gaspari's next complaint to Dr. Caldarelli was in May of 1999, at which time Mr. Gaspari stated that he recently had a sinus infection that was treated by Dr. Baldwin. *Id.* On this date, Dr. Caldarelli also stated that Mr. Gaspari "is an insulin dependent diabetic, it sounds like it is fairly brittle." *Id.*

Then, between the May 1999 visit and November of 2002, Dr. Caldarelli treated Mr. Gaspari for ear and sinus infections on

30

approximately fourteen different occasions. R. at 187-194. During each visit, Dr. Caldarelli either prescribed Mr. Gaspari with medications for his infections or followed-up on Mr. Gaspari's response to the medications. *Id.*

## D. DR. BROWN: NOVEMBER 2004 TO SEPTEMBER 2005

The record shows that Mr. Gaspari first saw Dr. Brown, an endocrinologist at the University of Chicago, in November of 2004. R. at 261. At this time, Dr. Brown noted that Mr. Gaspari was working as a police officer. *Id.* Dr. Brown's notes from November of 2004 state that, in terms of exercise, Mr. Gaspari was going to the health club. R. at 259. In her March 2005 notes, Dr. Brown stated that Mr. Gaspari exercised for three to five minutes, once or twice per week. *Id.* In these notes, Dr. Brown also indicated that Mr. Gaspari had lost his job the previous week. *Id.* When Dr. Brown saw Mr. Gaspari in September of 2005—approximately one week before his hearing before the ALJ—she noted that, in terms of exercise, Mr. Gaspari was "walking [and] trying to bike." R. at 253.

## E. DR. CULLINANE: MAY 2000 TO AUGUST 2005

On the Disability Report, Mr. Gaspari indicated that he first saw Dr. Timothy Cullinane, his treating psychiatrist, on May 20, 2000. R. at 139. However, the record only contains Dr. Cullinane's treatment notes from July of 2003 through August of 2005. R. at 268-71.

31

Dr. Cullinane completed a Psychiatric Report for the Bureau of Disability Determination Services in April of 2003 ("Psychiatric Report"). R. at 201-03. In the Psychiatric Report, Dr. Cullinane diagnosed Mr. Gaspari with GAD and OCD. R. at 203. Dr. Cullinane indicated that Mr. Gaspari has problems with occasional depression, but Dr. Cullinane did not explicitly diagnose Mr. Gaspari as having depression. R. at 201. Dr. Cullinane also noted that Mr. Gaspari was being treated with Parnate, Klonopin, and Chloralhydrate, and that he is somewhat stabilized on these medications. R. at 201, 203. Dr. Cullinane then indicated that the medications have "helped control [Mr. Gaspari's] obsessions and compulsions, but he is still quite anxious and somewhat depressed." R. at 203. Dr. Cullinane stated that, at Mr. Gaspari's last visit in March of 2003, he had a "constricted mood and mildly depressed affect." R. at 202. Dr. Cullinane also indicated that, in March of 2003, Mr. Gaspari had been working at the Illinois Department of Motor Vehicles, "and although he does not particularly like his work and seems to have some difficulty with it, he does continue to function at the job." R. at 201, 203. Finally, Dr. Cullinane noted that Mr. Gaspari "does not seem to get along well with coworkers and is constantly [reporting] . . . that there are conflicts there." R. at 202.

In July and October of 2003, Dr. Cullinane indicated that Mr. Gaspari was going to the health club. R. at 268. With regard to Mr. Gaspari's sleep, Dr. Cullinane noted that Mr. Gaspari stayed up until 4 a.m. on the computer, dating and applying for jobs, that he sleeps only four hours per night, and that he takes a two-and-a-half hour nap during the day. Id. In August of 2003, Dr. Cullinane indicated that Mr. Gaspari goes to Walgreens between 2 a.m. and 3 a.m. and "chit-chats" with the pharmacist for about thirty minutes. Id.

In December of 2003, Dr. Cullinane noted that Mr. Gaspari had found a job as an armed security guard. R. at 269. At this time, Mr. Gaspari apparently informed Dr. Cullinane that he couldn't earn more than $577 per month, because he was receiving state disability insurance from the Secretary of State's office, and, thus, could work only two days per week. Id. In the same treatment notes, Dr. Cullinane indicated that Mr. Gaspari has $15,000 in credit card debt. Id.

Dr. Cullinane's treatment notes from March of 2004 indicate that Mr. Gaspari was still working part-time as an armed security guard; in June of 2004, he also noted that Mr. Gaspari was "working a lot-36-40 hours" per week, six days per week. Id. His September 2004 treatment notes indicate that Mr. Gaspari was hired as a part-time police officer in Hometown, and was still working for the security company, for a total of thirty hours per

week.  R. at 271.  In February of 2005, Mr. Gaspari informed Dr. Cullinane that the police wanted him to resign.  *Id.*  Dr. Cullinane's treatment notes from March of 2005 state that Mr. Gaspari was "still out of work."  R. at 270.

Finally, in June of 2005, Dr. Cullinane noted that Mr. Gaspari was "distractible; forgetful; daydream; . . . impulsive; . . . fidget; trouble falling asleep; disorganized; hyper as a kid; teachers sometimes said he could do better if tried harder. . . . "  *Id.*

## F. DR. HOVSEPIAN: APRIL 2005

The record indicates that Dr. Hovsepian, Ph.D., S.C.A.C., completed a Psychological Testing Report after he examined Mr. Gaspari in April of 2005.  R. at 245-48.  Dr. Hovsepian indicated that Mr. Gaspari has "anxiety issues which appear to . . . strongly affect [his] functioning."  R. at 248.  In the Report, Dr. Hovsepian also indicated that Mr. Gaspari's "attention/concentration skills are well below average and represent his greatest weakness on the verbal subtest" of the WAIS-R, one of the psychological tests and procedures that Dr. Hovsepian conducted on Mr. Gaspari.  R. at 245-46.  Likewise, Dr. Hovsepian discussed Mr. Gaspari's "[p]oor sustained attention, concentration, and focus, along with signs of attentional drift."  R. at 246.  Furthermore, Dr. Hovsepian stated that Mr. Gaspari

34

"frequently appeared to mishear or misunderstand instructions given to him which needed to be repeated." *Id.* Finally, as part of Dr. Hovsepian's psychological testing, Mr. Gaspari completed the McCarney Scales of Attention Deficit Disorder, "which were rated by the patient," and which showed "involvement on the inattentiveness scale and borderline level of involvement on the hyperactive/impulsivity scale." R. at 247. At the end of this Report, Dr. Hovsepian diagnosed Mr. Gaspari with ADD. R. at 245, 248.

## CONSULTATIVE SOURCES

### A. Dr. Donald Cochran

Dr. Donald Cochran, Ph.D., completed a Psychiatric Review Technique form ("PRT") on May 22, 2003. R. at 206-19. Dr. Cochran indicated that Mr. Gaspari's "Medical Disposition" was "RFC Assessment Necessary." R. at 206. Dr. Cochran noted that the category upon which he based this decision was "12.06 Anxiety-Related Disorders." *Id.* In the "Documentation of Factors that Evidence the Disorder" section of the PRT, Dr. Cochran did not indicate that Mr. Gaspari suffered from any "Organic Mental Disorders," "Schizophrenic, Paranoid and Other Psychotic Disorders," "Affective Disorders," "Mental Retardation," "Somatoform Disorders," "Personality Disorders," Substance Addiction Disorders," or "Autistic Disorder and Other Pervasive Developmental Disorders." R. at 207-10, 212-15.

35

However, Dr. Cochran did note that Mr. Gaspari suffers from "Anxiety-Related Disorders." R. at 211. More specifically, Dr. Cochran checked the box that read, "Anxiety as the predominant disturbance or anxiety experienced in the attempt to master symptoms . . . " *Id.* Further, Dr. Cochran based this conclusion on evidence of "[r]ecurrent obsessions or compulsions which are a source of marked distress." *Id.* Dr. Cochran also checked the box that read, "A medically determinable impairment is present that does not precisely satisfy the diagnostic criteria above," after which he indicated that the disorders included "AD Dx: GAD, OCD." *Id.*

Next, in the "Rating of Functional Limitations" section and "'B' Criteria of the Listings" sub-section of the PRT, Dr. Cochran indicated the degree to which Mr. Gaspari has certain functional limitations as a result of his "mental disorder(s)," which Dr. Cochran specified as Listing 12.06.[3] R. at 216. Dr. Cochran placed a mild degree of limitation on "Restriction of Activities of Daily Living;" a moderate limitation on "Difficulties in Maintaining Social Functioning;" a mild limitation on "Difficulties in Maintaining Concentration, Persistence, or Pace;" and indicated that there were no "Episodes of Decompensation, Each of Extended Duration." *Id.* Then, under

---

[3] Listing 12.06 corresponds to Anxiety-Related Disorders. *See* R. at 206.

the "'C' Criteria of the Listings"[9] section, Dr. Cochran
specified that the "[e]vidence does not establish the presence of
the 'C' criterion." R. at 217.

Dr. Cochran also completed a Mental Residual Functional
Capacity Assessment ("Mental RFC Assessment") on May 22, 2003.
R. at 220-22. Under the "Summary Conclusions" section, the
directions state: "This section is for recording summary
conclusions derived from the evidence in file. Each mental
activity is to be evaluated within the context of the
individual's capacity to sustain that activity over a normal
workday and workweek, on an ongoing basis. . . . " R. at 220.
In the "Understanding and Memory" sub-section, Dr. Cochran
checked the "Not Significantly Limited" box for each item: "The
ability to remember locations and work-like procedures;" "The
ability to understand and remember very short and simple
instructions;" and "The ability to understand and remember
detailed instructions." *Id.*

Under the "Sustained Concentration and Persistence" sub-
section, Dr. Cochran checked the "Not Significantly Limited" box
for the following items: "The ability to carry out very short and
simple instructions;" "The ability to carry out detailed

[9] For Listing of Impairment 12.06 Anxiety-Related Disorders, "[t]he required
level of severity . . . is met when the requirements in both A and B are
satisfied, or when the requirements in both A and C are satisfied. 20 C.F.R.
Pt. 404, Subpt. P, App. 1, § 12.06.

37

instructions;" "The ability to sustain an ordinary routine
without special supervision;" "The ability to make simple work-
related decisions;" and "The ability to complete a normal workday
and workweek without interruptions from psychologically based
symptoms and to perform at a consistent pace without an
unreasonable number and length of rest periods." R. at 220-21.
However, Dr. Cochran checked the "Moderately Limited" box for the
following items under this sub-section: "The ability to maintain
attention and concentration for extended periods;" "The ability
to perform activities within a schedule, maintain regular
attendance, and be punctual within customary tolerances;" and
"The ability to work in coordination with or proximity to others
without being distracted by them." R. at 220.

Under the "Social Interaction" sub-section, Dr. Cochran
checked the "Not Significantly Limited" box for the following
items: "The ability to ask simple questions or request
assistance;" "The ability to accept instructions and respond
appropriately to criticism from supervisors;" "The ability to get
along with coworkers or peers without distracting them or
exhibiting behavioral extremes;" and "The ability to maintain
socially appropriate behavior and to adhere to basic standards of
neatness and cleanliness." R. at 221. The only item in this
sub-section for which Dr. Cochran checked the "Moderately

Limited" box was "The ability to interact appropriately with the general public." *Id.*

Under the "Adaptation" sub-section, Dr. Cochran checked the "Not Significantly Limited" box for the following items: "The ability to be aware of normal hazards and take appropriate precautions;" "The ability to travel in unfamiliar places or use public transportation;" and "The ability to set realistic goals or make plans independently of others." *Id.* For the item in this sub-section listed as "The ability to respond appropriately to changes in the work setting," Dr. Cochran checked the box labeled "No Evidence of Limitation in this Category." *Id.*

Finally, the directions under the "Functional Capacity Assessment" section of the Mental RFC Assessment read as follows: "Record in this section the elaborations on the preceding capacities. . . . Explain your summary conclusions in narrative form. Include any information which clarifies limitation or function. Be especially careful to explain conclusions that differ from those of treating medical sources or from the individual's allegations." R. at 222. Dr. Cochran's only notes in this section were: "[Mr. Gaspari] has [symptoms] of [anxiety] and depression that he states are primarily related to his physical problems. [Mr. Gaspari's] MSE and ADL indicate that he is capable of simple, routine tasks." *Id.*

**B. Dr. Stanley Rabinowitz**

Dr. Stanley Rabinowitz, M.D., examined Mr. Gaspari in October of 2004, at the request of the State of Illinois Disability Determination Services. R. at 224-27. Dr. Rabinowitz's notes state that Mr. Gaspari has had insulin-dependent diabetes mellitus since 1995, and that he is taking "Novolog on a sliding scale depending on carbohydrate intake and Lantis insulin." R. at 224. However, Dr. Rabinowtiz noted that "[t]here have been no symptoms or end organ complications of the diabetes, specifically no history of diabetic retinopathy, neuropathy, renal insufficiency, or peripheral vascular disease." *Id.*

Dr. Rabinowitz also stated that, as a result of the GBS, Mr. Gaspari "had only mild residual neurological symptoms, including mild left ptosis[19] and absent reflexes in the lower extremities." *Id.* He also indicated that Mr. Gaspari has had hypertension since 1989, and that he is currently taking Cozaar, along with furosemide, each day. *Id.* Dr. Rabinowitz noted that Mr. Gaspari's blood pressure readings "remain mildly elevated in spite of therapy," but that "[t]here have been no symptoms or end organ complications of the hypertension, specifically, there is

---

[19] Ptosis refers to a "sinking down or prolapse of an organ." Stedman's Medical Dictionary, PTOSIS (27th ed. 2000).

40

no history of neurological, renal, or cardiovascular impairment."
*Id.*

Next, Dr. Rabinowitz noted that Mr. Gaspari has had left
knee pain for the last ten years, and that he suffers from
degenerative disc disease involving the lower lumbar spine. R.
at 225. More specifically, Dr. Rabinowitz noted that Mr. Gaspari
"does complain of left knee pain and stiffness and chronic low
back pain which occasionally radiates down the right
leg. . . . On a scale of 1 to 10 with 10 being the most severe
pain, the low back pain, on average, is rated as '7.5-8 over 10'
and is not exacerbated by coughing or sneezing." *Id.* Dr.
Rabinowitz further noted that Mr. Gaspari "takes over-the-counter
Tylenol" for his back and knee pain. *Id.*

Finally, Dr. Rabinowitz stated that Mr. Gaspari has a
history of generalized anxiety, chronic depression, and panic
attacks. R. at 224. Dr. Rabinowitz also indicated that Mr.
Gaspari "was working part-time for a security firm until 3-4
weeks ago." *Id.*

## C. Dr. Gontaco Reynaldo

Dr. Gontaco Reynaldo completed a Physical Residual
Functional Capacity Assessment ("Physical RFC Assessment") on
November 10, 2004, basing his conclusions on all the evidence in
Mr. Gaspari's file. R. at 229-36. Under the "Exertional
Limitations" section, Dr. Reynaldo indicated that Mr. Gaspari

41

could occasionally lift twenty pounds; frequently lift ten pounds; stand or walk with normal breaks for a total of about six hours in an eight-hour workday; sit with normal breaks for a total of about six hours in an eight-hour workday; and push or pull without any limitations, other than those shown for lifting and carrying. R. at 230. In explaining how and why the evidence supports his conclusions on these items, Dr. Reynaldo stated, "[Mr. Gaspari] has diabetes mellitus with no end organ damage. He alleges numbness of the lower extremities but at C.E. on 10/26/04 there were [sic] no motor or sensory loss. Ambulates with a cane but can walk up to 50 feet without assistive device with a slow but not limping gait." *Id.*

Under the "Postural Limitations" section of the Physical RFC Assessment, Dr. Reynaldo found that Mr. Gaspari is frequently limited in climbing ramps or stairs, and in balancing. R. at 231. In addition, Dr. Reynaldo found that Mr. Gaspari is occasionally limited in: climbing ladders, ropes, or scaffolds; stooping; kneeling; crouching; and crawling. When asked to "[c]ite the specific facts upon which [his] conclusions are based," Dr. Reynaldo indicated that "[Mr. Gaspari] has pain in the knees and back. At C.E. he has absent reflexes in the ankle on both sides but no sensory loss. Lumbar spine flexion is 65 degrees." *Id.*

Dr. Reynaldo found that Mr. Gaspari does not have any
"Manipulative Limitations," "Visual Limitations," "Communicative
Limitations," or "Environmental Limitations." R. at 232-33. Dr.
Reynaldo further indicated that "a treating or examining source
statement(s) regarding [Mr. Gaspari's] physical capacities" was
not in Mr. Gaspari's file. R. at 235. Finally, Dr. Reynaldo
made the following comments: "[Mr. Gaspari] had Guillain Barre
syndorme [sic] in 1989 with residual mild left ptosis and absent
ankle reflexes. [T]he hypertension has been treated since 1989
and is controlled with medications. [His] back pain decreased
his lumbar spine flexion to 65 degrees. He can walk without the
cane. A lumbar spine xray is negative.[11] The diabetes mellitus
is controlled with medications. The ADL's are not limited and
[he] is able to ride a bike on a nice day." R. at 236.

## **THE ALJ'S DECISION**

The ALJ issued his decision on February 13, 2006, finding
that Mr. Gaspari was not disabled, and denying his claim for
benefits. R. at 20, 28. First, the ALJ found that Mr. Gaspari
had engaged in substantial gainful activity during 2004; thus, he
defined the relevant period as beginning on January 1, 2005. R.
at 21. The ALJ next found that Mr. Gaspari suffers from

---

[11] It appears as though Dr. Reynaldo based this conclusion on Dr. Deepak
Dalia's Radiology Report. *See* R. at 228. However, in that Report, Dr. Dalia
indicated that the x-rays of Mr. Gaspari's lumbar spine were "suboptimal due
to processing difficulty and partly due to [Mr. Gaspari's] body habitus," and
that "the examination needs to be repeated." R. at 228. Dr. Dalia concluded
that the examination of the films was only a "limited study." *Id.*

hypertension, diabetes mellitus, degenerative joint disease, and a history of GBS- the combination of which is "severe" – as well as "severe" OCD. *Id.* Notably, the ALJ found that the record lacked any "convincing evidence of [ADD], or any other severe mental impairment(s)." *Id.*

Furthermore, the ALJ found that Mr. Gaspari did not meet or equal the requirements for any listed physical impairment appearing in Appendix 1 to Subpart P, Regulations No. 4. *Id.* The ALJ based this conclusion on the consultative reports and notes from Dr. Rabinowitz and Dr. Baldwin. R. at 22. In addition, based on testimony from Dr. Biscardi, the 2003 and 2004 ADL Questionnaires, and the Third Party ADL Questionnaire, the ALJ found that Mr. Gaspari was "mildly limited in activities of daily living and ability to maintain concentration, persistence or pace, and moderately restricted in social functioning." R. at 23. Despite this conclusion, the ALJ found that there were "no documented episodes of decompensation in the record, and none of the 'C' criteria under the mental listings is present." *Id.* As a result, the ALJ agreed with Dr. Cochran, the State agency psychologist, finding that Mr. Gaspari did not meet or equal the criteria for a mental listing. *Id.*

The ALJ adopted ME Ezike's testimony regarding restrictions in forming Mr. Gaspari's physical RFC. R. at 25. The ALJ noted that ME Ezike testified that Mr. Gaspari should be physically

capable of performing a wide range of light work activity, that he can lift and carry ten pounds frequently and twenty pounds occasionally, and that he can walk for four to six hours with normal breaks during an eight hour day. *Id.* The ALJ also noted that ME Ezike testified that, "since [Mr. Gaspari] *may* experience some drowsiness from his condition and/or medications," he can only occasionally climb three to five stairs or a three-foot ladder, and "should avoid concentrated exposure to operating machinery." *Id.* (emphasis in original). The ALJ noted that ME Ezike's testimony on these issues was generally consistent with the State agency report submitted by Dr. Reynaldo. *Id.* Although Dr. Reynaldo also imposed occasional restrictions "against some postural activities, i.e., stooping, kneeling, crouching and crawling," the ALJ deferred to ME Ezike's opinion that the evidence does not support these additional limitations. *Id.* Additionally, the ALJ did not find anything in Dr. Rabinowitz's report that indicated a substantial interference with Mr. Gaspari's ability to sit, walk, handle, or manipulate. *Id.* The ALJ also noted that Dr. Brown's treatment notes, which were submitted after the hearing, did not change his opinion in any way. *Id.*

Similarly, the ALJ adopted PE Biscardi's testimony in defining Mr. Gaspari's mental RFC-noting that PE Biscardi agreed with the findings by Dr. Cochran, the State agency psychologist,

who had reviewed the record in 2003. *Id.* In particular, the ALJ found that Mr. Gaspari is moderately limited in his ability to maintain attention and concentration for extended periods, to perform activities within a schedule, to maintain regular attendance and be punctual within customary tolerances, to work in coordination with or proximity to others without being distracted by them, and to interact appropriately with the general public. *Id.* The ALJ also noted that Dr. Cullinane's treatment notes, which were submitted after the hearing, did not change his opinion in any way. *Id.*

The ALJ concluded that Mr. Gaspari's testimony was only "partially credible." *Id.* First, the ALJ noted a "possible discrepancy regarding [Mr. Gaspari's] work activity in 2003," because Mr. Gaspari testified that he was not employed during 2003, yet Dr. Cullinane's treatment notes indicate otherwise. R. at 24. In addition, the ALJ stated that, "by his own admission, [Mr. Gaspari] has worked almost continuously on a part-time basis since at least 2004." *Id.* And, while Mr. Gaspari's attorney stated that he must "'push himself'" to work ten to twelve hours per week, Mr. Gaspari was working as a security guard for almost forty hours per week in June of 2004, and then he took a second job three months later. *Id.* (citing R. at 269, 271, 300). Finally, the ALJ indicated that, when Mr. Gaspari applied for unemployment compensation in 2005, he certified that he was

46

"ready, willing and able to work full-time," but that such a certification is "incompatible with [his] application for disability-based benefits under Social Security, and reflects negatively on his overall credibility." R. at 24.

Based upon his determination of Mr. Gaspari's RFC, and in agreement with VE Grzesik, the ALJ found that Mr. Gaspari was unable to perform any of his past relevant work. R. at 26. However, the ALJ found that Mr. Gaspari was capable of performing a "significant range of light work," and, thus, could also do sedentary work. *Id.* The ALJ agreed with VE Grzesik's testimony, and found that other jobs existed in significant numbers in the national economy that Mr. Gaspari could perform. *Id.*

## STANDARD OF REVIEW

A district court reviewing an ALJ's decision must affirm if the decision is supported by substantial evidence and is free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "more than a mere scintilla"; rather, it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In reviewing an ALJ's decision for substantial evidence, the Court may not "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (citing *Jens v.*

47

*Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003)). Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the courts. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990).

An ALJ must articulate his analysis by building an accurate and logical bridge from the evidence to his conclusions, so that the Court may afford the claimant meaningful review of the SSA's ultimate findings. *Steele*, 290 F.3d at 941. It is not enough that the record contains evidence to support the ALJ's decision; if the ALJ does not rationally articulate the grounds for that decision, or if the decision is not sufficiently articulated, so as to prevent meaningful review, the Court must remand. *Id.*

## SOCIAL SECURITY REGULATIONS

An individual claiming a need for DBI or SSI must prove that he or she has a disability under the terms of the SSA. In determining whether an individual is eligible for benefits, the social security regulations require a sequential five step analysis. First, the ALJ must determine if the claimant is currently employed; second, a determination must be made as to whether the claimant has a severe impairment; third, the ALJ must determine if the impairment meets or equals one of the impairments listed by the Commissioner in 20 C.F.R. Part 404, Subpart P, Appendix 1; fourth, the ALJ must determine the

claimant's RFC, and must evaluate whether the claimant can perform his or her past relevant work; and fifth, the ALJ must decide whether the claimant is capable of performing work in the national economy. *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995). At steps one through four, the claimant bears the burden of proof; at step five, the burden shifts to the Commissioner. *Id.*

## DISCUSSION

## I. The ALJ's Failure to Confirm That the VE's Testimony Was Consistent with the DOT Requires Remand

Mr. Gaspari first argues that the ALJ failed to question whether VE Grzesik's testimony was consistent with the Dictionary of Occupational Titles (DOT) at step five. The error, Plaintiff argues, require remand, because the ALJ had an affirmative duty to do so. Social Security Ruling 00-4p requires an ALJ to question the VE on the record regarding any possible conflict between the VE's testimony and the information provided in the DOT. SSR 00-4p, Westlaw, *2, 4. Moreover, the ALJ's obligation is part of his broader duty to fully develop the record. *Id.* at *2; *Prochaska v. Barnhart*, 454 F.3d 731, 735 (7th Cir. 2006) (holding that the ALJ failed to comply with SSR 00-4p, because the ALJ did not ask the vocational expert whether his testimony conflicted with the DOT).

The Commissioner has conceded the oversight, admitting that, because the ALJ's consideration of the vocational evidence was deficient, it is unclear whether the jobs identified by VE Grzesik in response to the ALJ's hypothetical question are consistent with the DOT. Indeed, the Commissioner earlier sought a voluntary remand on this limited issue. The Court agrees that the ALJ's error necessitates remanding this case to the SSA for further proceedings. This is not the end of the Court's inquiry; Mr. Gaspari asserts that the ALJ made several other errors, and the Court will address his arguments in full.

## II. The ALJ's Consideration of Other Vocational Evidence

Mr. Gaspari argues that the hypotheticals posed by the ALJ to VE Grzesik were fatally flawed in several respects. First, Mr. Gaspari argues that the ALJ was required to include an unskilled work limitation in his hypotheticals, since the ALJ limited his consideration to unskilled jobs. When posing a hypothetical question to the VE, the ALJ must include "all limitations supported by medical evidence in the record." *Steele*, 290 F.3d at 942. While the ALJ found that Mr. Gaspari was limited to performing unskilled jobs, the ALJ neglected to include that limitation in his hypothetical to VE Grzesik. R. at 26, 365. However, the VE testified that all three jobs that Mr. Gaspari would be capable of doing in the national economy were unskilled jobs. R. at 368. Thus, the ALJ's failure to include

the unskilled work limitation in his hypothetical to the VE was
harmless error. *See Keys v. Barnhart*, 347 F.3d 990, 994-95 (7th
Cir. 2003) (recognizing that the "doctrine of harmless
error . . . is fully applicable to judicial review of
administrative decisions").

Mr. Gaspari next argues that the ALJ improperly told the VE
that Mr. Gaspari was only moderately limited in his ability to
climb stairs, without explaining to the VE that Mr. Gaspari could
climb only three to five stairs.[12] Mr. Gaspari's second attack
on the ALJ's hypothetical also misses the mark. While the ALJ
must incorporate into his hypothetical each of a claimant's
impairments, an exception "exists for cases in which the [VE]
independently learned of the limitations (*through other
questioning at the hearing* . . . , for example) and presumably
accounted for them." *Steele*, 290 F.3d at 942 (emphasis added).
*See also Ragsdale v. Shalala*, 53 F.3d 816, 820 (7th Cir. 1995)
(holding that the district court properly concluded that the
vocational expert considered the claimant's various impairments,
because the vocational expert reviewed the claimant's record
prior to, and was present at, the hearing). In this case, VE
Grzesik was present for the entire hearing, during which ME Ezike
testified that Mr. Gaspari had a "moderate limitation" on his

---

[12] In defining Mr. Gaspari's RFC, the ALJ concluded that Mr.
Gaspari could climb only three to five stairs.  R. at 25.

51

ability to climb, which he immediately specified as meaning "three to five stairs." R. at 346. Furthermore, the VE had reviewed Mr. Gaspari's record before the hearing. R. at 360. Thus, it is reasonable to assume that VE Grzesik accounted for the specific quantitative limitation on climbing, despite the fact that the ALJ only defined it as a "moderate limitation."

Finally, Mr. Gaspari argues that the ALJ erred in failing to consider the VE's responses to all hypotheticals, and in failing to explain why he rejected some responses and accepted others. In particular, Mr. Gaspari asserts that the ALJ failed to consider the VE's testimony that a claimant who missed one to two days of work per month, or who needed one to two unscheduled breaks per week, could not sustain employment.

The Seventh Circuit has clearly articulated that "[a]n ALJ may not simply select and discuss only that evidence which favors his ultimate conclusion. Rather, an ALJ's decision must be based upon consideration of all the relevant evidence." *Smith v. Apfel*, 231 F.3d 433, 438 (7th Cir. 2000) (citation omitted); *see also Connor v. Shalala*, 900 F. Supp. 994, 1003 (N.D. Ill. 1995) (holding that the ALJ erred in failing to explicitly consider the vocational expert's testimony on cross-examination, in which he stated that the claimant's absences may preclude him from unskilled work, because the ALJ relied on other aspects of the vocational expert's testimony in his decision).

Here, VE Grzesik's testimony concerning the possible consequences of Mr. Gaspari's absenteeism and required breaks was relevant evidence, because the ALJ, in determining Mr. Gaspari's RFC, found that Mr. Gaspari is moderately limited in his ability to perform activities within a schedule, and to maintain regular attendance and be punctual within customary tolerances. R. at 27-28; see Apfel, 231 F.3d at 438. Furthermore, as in Connor, the ALJ relied heavily on VE Grzesik's testimony in determining that Mr. Gaspari was not disabled. See 900 F. Supp. at 1003. Nevertheless, the ALJ did not explicitly consider the VE's testimony that Mr. Gaspari would likely be precluded from employment if he missed one to two days of work per month, or if he took one to two unscheduled breaks per week. That is, even if the ALJ considered this testimony, he did not explain why he rejected it, while accepting other testimony from VE Grzesik. See id. This Court cannot speculate as to his reasons for doing so. Upon remand, the Court directs the ALJ to expressly consider the VE's testimony on cross-examination.

## III. The ALJ's Credibility Determination.

Mr. Gaspari argues that the ALJ improperly evaluated his credibility pursuant to SSR 96-7p. Generally, this Court gives substantial deference to the ALJ's credibility determination, because the ALJ is in the best position to make such a determination. Powers v. Apfel, 207 F.3d 431, 435 (7th Cir.

2000). However, the Court will review a credibility determination when the ALJ fails to explain why he found the evidence or testimony to be incredible. *Steele*, 290 F.3d at 942.

When evaluating the claimant's credibility, the ALJ must consider the entire record, and the ALJ's credibility determination "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." SSR 96-7p, Westlaw, *1-2; *see Clifford v. Apfel*, 227. F.3d 863, 872 (7th Cir. 2000). In his opinion, the ALJ set forth several reasons for finding that Mr. Gaspari's testimony was only "partially credible." R. at 24-25. One of the factors upon which the ALJ relied was that Mr. Gaspari, "by his own admission, ha[d] worked almost continuously on a part-time basis since at least 2004," and that he admitted to Dr. Cullinane in late 2003 that he needed to limit his earnings, so that he would not risk losing his State disability insurance. R. at 25 (citing R. at 269). Further, the ALJ noted that, "contrary to assertions at the hearing that he must 'push himself' to work even 10 or 12 hours per week, he was reportedly working 36 to 40 hours per week in his security job by June 2004, and even took on a *second* job as a part-time police officer just three months later." R. at 25 (emphasis in original). Thus, based on Mr. Gaspari's recent work history, the ALJ concluded that Mr. Gaspari "is obviously not so

54

fatigued and/or debilitated that he cannot work *in some capacity* on a sustained basis." *Id.* (emphasis in original).

The ALJ also based his credibility determination, in part, on the inconsistencies between Mr. Gaspari's testimony and the evidence in the record concerning his work activity in 2003. *Id.* When the ALJ asked Mr. Gaspari about the source of his 2003 income, Mr. Gaspari testified that he had received disability disbursements from the Secretary of State's office. R. at 321. At the hearing, Mr. Gaspari also stated twice that he did not work at all in 2003. R. at 321-22. However, Dr. Cullinane stated in the Psychiatric Report that, when he last saw Mr. Gaspari on March 3, 2003, he "was going to work for the Illinois Department of Motor Vehicles." R. at 201. In the Report, Dr. Cullinane also stated that Mr. Gaspari had been "working regularly" and "continue[s] to function at the job." R. at 203.

When assessing a claimant's credibility, the ALJ may rely on inconsistencies between the claimant's testimony and the evidence in the record. *Anderson v. Bowen*, 868 F.2d 921, 927 (7th Cir. 1989). In *Anderson*, the Seventh Circuit held that the ALJ reasonably determined that the claimant's credibility was undermined by various discrepancies between his testimony and the evidence in the record. 868 F.2d at 927. For instance, the claimant testified that he did not have chest pain in August of

1985; however, in December of 1985, he claimed to have had chest pain for the previous five years. *Id.*

Similarly, in the case at bar, it was appropriate for the ALJ to consider the discrepancies between Mr. Gaspari's testimony and the record evidence in evaluating Mr. Gaspari's credibility. Mr. Gaspari cannot deny his testimony that he did not work in 2003. Yet credible evidence in the record indicates otherwise. R. at 201, 321-22. The Court concludes that the ALJ reasonably determined that this inconsistency reflected negatively on Mr. Gaspari's credibility. *See* R. at 24.

The ALJ also based his crediblity determinations upon affirmative statements that Mr. Gaspari made with regard to his ability to work during the relevant time period. Mr. Gaspari filed for unemployment compensation in early 2005, and certified that "he was ready, willing and able to do work full-time." *Id.* It is appropriate for the ALJ, when assessing a claimant's credibility, to consider representations the claimant has made to state authorities that he can work. *Schmidt v. Barnhart*, 395 F.3d 737, 746 (7th Cir. 2005) ("We are not convinced that a Social Security claimant's decision to apply for unemployment benefits and represent to state authorities and prospective employers that he is able and willing to work should play absolutely *no* role in assessing his subjective complaints of disability") (emphasis in original). Thus, the ALJ reasonably

determined that the representations Mr. Gaspari made when filing
for unemployment compensation were "incompatible" with his claim
that he is disabled and unable to work on a regular basis, and he
reasonably identified this incompatibility as one of the many
factors adversely affecting Mr. Gaspari's credibility. *See id.*

Next, Mr. Gaspari claims that the ALJ erred by equating his
activities of daily living ("ADLs") with his ability to perform
and sustain full-time work. On numerous occasions, the Seventh
Circuit has "cautioned the [SSA] against placing undue weight on
a claimant's household activities in assessing the claimant's
ability to hold a job outside the home," by noting that "[t]he
pressures, the nature of the work, flexibility in the use of
time, and other aspects of the working environment as well, often
differ dramatically between home and office or factory or other
place of paid work." *Mendez v. Barnhart*, 439 F.3d 360, 362 (7th
Cir. 2006); *see e.g. Gentle v. Barnhart*, 430 F.3d 865, 867 (7th
Cir. 2005). However, while the ALJ found that Mr. Gaspari's wide
range of ADLs were inconsistent with his allegation of
disability, the ALJ did not place "undue weight" on Mr. Gaspari's
ADLs. *See Mendez*, 439 F.3d at 362. Instead, the ALJ specified
numerous reasons for finding Mr. Gaspari's testimony only
"partially credible," and the ADL finding was merely one of these
reasons. *See Skarbek v. Barnhart*, 390 F.3d 500, 505 (7th Cir.
2004) (holding that the ALJ complied with the requirements of SSR

96-7p, even though the ALJ only provided two reasons for his credibility determination—one of which was that the claimant's testimony regarding his daily activities did not support a finding that he was totally disabled). Therefore, the ALJ did not err on this point.

Mr. Gaspari also claims that the ALJ mischaracterized his testimony and other statements throughout the record with regard to his ADLs. While the ALJ thoroughly summarized Mr. Gaspari's ADLs, and his description was *generally* consistent with the information provided in the 2003 and 2004 ADL Questionnaires, as well as the Third Party Questionnaire, the ALJ *did* mischaracterize certain evidence contained in the record. *See* R. at 22-23. For example, the ALJ stated that Mr. Gaspari indicated on the 2003 ADL Questionnaire that he "takes his medications on his own," when, in fact, he indicated that his mother reminds him to do so at least once each day. R. at 22, 161. Although this Court would not have remanded based solely upon this potentially inconsequential mischaracterization—as, again, the ALJ mentioned Mr. Gaspari's ADLs as *one of the many* reasons for finding Mr. Gaspari's testimony only partially credible-- on remand, the ALJ should rectify the mischaracterization.

Finally, Mr. Gaspari argues that the ALJ erred by improperly evaluating his testimony concerning his diabetes and fatigue, which was supported by ME Ezike's testimony. At the hearing, ME

Ezike testified that it is "possible" that Mr. Gaspari's testimony concerning his fatigue, as well as the symptoms he experienced during periods of high or low sugar levels, could be consistent with his medications and impairments. R. at 348-49.

Despite Mr. Gaspari's and ME Ezike's uncontradicted testimony, the ALJ found that, while Mr. Gaspari's "glucose and blood pressure levels tend to run high, they are not 'uncontrolled' to the point they would produce their own significant symptomatology [sic]." R. at 25. Thus, Mr. Gaspari asserts that the ALJ needed to explain why he rejected ME Ezike's opinion concerning Mr. Gaspari's credibility, especially because the ALJ adopted the ME's testimony concerning Mr. Gaspari's RFC. *See id.*

However, more troubling than the ALJ's failure to explain why he rejected ME Ezike's opinion on this point, is the fact that the ALJ made an independent medical finding. The Seventh Circuit has repeatedly held that an ALJ cannot "play doctor" by making an independent medical finding. *See e.g. Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 570 (7th Cir. 2003); *Herron v. Shalala*, 19 F.3d 329, 334 n.10 (7th Cir. 1994). In concluding that Mr. Gaspari's diabetes was not as "uncontrolled" as Mr. Gaspari claimed, the ALJ stated that he based this determination on medical evidence contained in the record, but his only reference to the evidence was to the fact that Mr. Gaspari's "glucose levels averaged 156 after 119 readings in early 2005."

R. at 25 (citing R. at 239). The ALJ did not point to, nor has the Court identified, any evidence or expert testimony in this case that would have allowed the ALJ to conclude that an individual's diabetes is not "uncontrolled" because his glucose level averaged 156 in 2005. Thus, the ALJ was undeniably making an independent medical finding—one which he is not permitted to make. *See Herron*, 19 F.3d at 334 n.10.

In conclusion, the Court finds that the ALJ's crediblity determination was largely supportable. However, upon remand the ALJ should more carefully describe Plaintiff's reported abilities and limitations, and, more importantly, should resist the urge to play doctor.

## IV. The ALJ's Analysis of Medical Opinions Pursuant to 20 C.F.R. § 404.1527(d).

Mr. Gaspari's final argument is that the ALJ failed to properly analyze medical opinions pursuant to 20 C.F.R. § 404.1527(d). Mr. Gaspari asserts that the ALJ failed to explain why he discredited the opinions of Dr. Patel and Dr. Caldarelli, who he claims are his "treating physicians." 20 C.F.R. § 404.1527(d)(2).

With regard to Dr. Patel, the Commissioner asserts that the ALJ properly rejected his opinion, largely because the record does not reveal whether Dr. Patel even qualifies as a "treating physician." *See id.* With regard to Dr. Caldarelli, the

Commissioner asserts that the ALJ's judgment was proper because, while he diagnosed Mr. Gaspari with diabetes, Dr. Caldarelli never treated him for diabetes, but instead treated him for ear and sinus infections. In response, Mr. Gaspari argues that, even if Drs. Patel and Caldarelli were not "treating physicians," the ALJ still had an obligation to evaluate their opinions and articulate his reasons for giving them a particular weight, pursuant to the requirements of 20 C.F.R. § 1527(d).

The ALJ may have disregarded or discredited Dr. Patel's and Dr. Caldarelli's opinions for the reasons urged by the Commissioner. Nevertheless, "general principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ." *Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003). Therefore, because the ALJ did not explain why he rejected or discredited these physicians' opinions - in fact, the ALJ did not even *mention* Dr. Patel's or Dr. Caldarelli's assessments in his opinion -- the ALJ committed legal error, as the ALJ had an obligation to explain why he rejected or discredited these physicians' opinions. *See* 20 C.F.R. § 1527(d) ("Regardless of its source, we will evaluate every medical opinion we receive").

Likewise, Mr. Gaspari argues that the ALJ failed to properly weigh Dr. Rabinowitz's diagnoses, such as degenerative disc

disease and chronic back pain syndrome.  In response to this
argument, the Commissioner asserts that the ALJ did not address
Dr. Rabinowitz's diagnoses, because the record did not contain
any treatment records related to back pain and impairment.  For
instance, the Commissioner highlights the fact that, although Mr.
Gaspari told Dr. Rabinowitz that he had seen Dr. Bach for back
pain, none of Dr. Bach's treatment notes appeared anywhere in the
record.

However, the statutory requirements of 20 C.F.R. § 1527(d)
also illustrate that the ALJ erred in failing to explain why he
rejected or discredited Dr. Rabinowitz's opinion.  *See id.*  Dr.
Rabinowitz's opinion was favorable to Mr. Gaspari's claim.
Accordingly, the ALJ had an obligation to consider and explain
his treatment of this evidence.  *See Nelson v. Apfel*, 131 F.3d
1228, 1237 (7th Cir. 1997); *Rohan v. Chater*, 98 F.3d 966, 971
(7th Cir. 1996) (holding that an ALJ has a duty to "minimally
articulate" his analysis of evidence favorable to the claimant
from a treating or examining physician).

The Commissioner's argument—that the ALJ properly
disregarded Dr. Rabinowitz's diagnoses of back pain and
impairment, based on the fact that the record lacked evidence
from treating physicians concerning these diagnoses—is unfounded.
If the ALJ was concerned that Dr. Rabinowitz's diagnoses lacked
objective medical support, "the ALJ had a mechanism to rectify

that problem. An ALJ has a duty to solicit additional information to flesh out an opinion for which the medical support is not readily discernable." *Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004) (citing 20 C.F.R. § 404.1527(c)(3)). In this instance, the ALJ could have subpoenaed Dr. Rabinowitz, or even Dr. Bach, for further explanation. *See Barnett*, 381 F.3d at 669. By rejecting or discrediting Dr. Rabinowitz's diagnoses without fulfilling this duty, and without explaining his reasons for doing so, the ALJ committed clear error. *See id.*

Next, Mr. Gaspari argues that the ALJ improperly rejected Dr. Hovsepian's ADD diagnosis, in favor of PE Biscardi's opinion. Mr. Gaspari argues that, in concluding that Dr. Hovespian's opinion was not well supported, the ALJ improperly relied on PE Biscardi's statements that: 1) there were no clinical laboratory results supporting a diagnosis of ADD; and 2) Dr. Hovsepian's diagnosis was based solely upon Mr. Gaspari's self-report. R. at 21. In contrast, the ALJ appears to have concluded that PE Biscardi's opinion was well supported, as he ultimately gave PE Biscardi's non-examining opinion greater weight than Dr. Hovsepian's examining opinion. The ALJ noted that PE Biscardi testified that "there were no findings pertaining to the claimant's ability to perform calculations, use abstract thinking or judgement [sic], or recognize similarities and differences," and that PE Biscardi observed that, "during the hearing, which

63

lasted approximately 90 minutes, the claimant seemed to concentrate, and respond well to questioning." *Id.*

Mr. Gaspari's argument is premised on his characterization of Dr. Hovsepian as an "examining psychologist," whose opinion should be entitled to greater weight than that of PE Biscardi, a non-examining psychologist. *See* 20 C.F.R. § 1527(d)(1) ("Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you"). Although an ALJ may afford the opinion of a non-examining physician more weight than that of an examining physician, the ALJ may do so "only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003) (citing *Moore v. Barnhart*, 278 F.3d 920, 924 (9th Cir. 2002)). Furthermore, pursuant to 20 C.F.R. § 404.1527(d)(2), an ALJ must give controlling weight to a treating physician's medical opinion if it is "well-supported by medically acceptable clinical and laboratory diagnostic technique" and is "not inconsistent with the other substantial evidence." *See generally Hofslien v. Barnhart*, 439 F.3d 375 (7th Cir. 2006) (discussing 20 C.F.R. § 404.1527(d)(2) at length).

Here, PE Biscardi not only provided a contradictory opinion to that of Dr. Hovsepian, but he also pointed to (a lack of)

64

evidence in the record—for instance, that there were no actual signs or laboratory data supporting an ADD diagnosis. And, in any event, the ALJ determined that Dr. Hovsepian's opinion was not "well-supported by medically acceptable clinical and laboratory diagnostic technique." *See Hofslien*, 439 F.3d at 376. Therefore, the ALJ was not required to give Dr. Hovsepian's opinion controlling weight, and he reasonably explained why he afforded Dr. Hovsepian's opinion less weight than he did PE Biscardi's opinion. *See id.*; 20 C.F.R. § 404.1527(d)(2).

Finally, Mr. Gaspari asserts that the ALJ erred by relying on PE Biscardi's testimony, which Mr. Gaspari claims was based on a legally incorrect understanding of a "marked limitation." Mr. Gaspari contends that the difference between whether he was markedly or moderately limited is critical to his claim, because the VE testified that, if Mr. Gaspari was markedly limited in some areas, he could not perform any work. *See* R. at 367-68.

The Court agrees that PE Biscardi's testimony as to the definition of a "marked limitation" was incorrect. PE Biscardi testified that a marked limitation "would be a limitation that would preclude that ability in a work setting," R. at 358, but this is actually the definition of an *extreme* limitation. 20 C.F.R. § 404.1520a(c)(4). However, even if the ALJ was precluded from adopting PE Biscardi's opinion because of this misunderstanding, the record still contained evidence supporting

the ALJ's decision. Dr. Cochran's assessment of Plaintiff's condition was essentially equivalent to PE Biscardi's assessment. *See* R. at 355, 358 (PE Biscardi testified that he agreed with Dr. Cochran's conclusions in the PRT and the Mental RFC Assessment, and that "there are some limitations certainly imposed, but it doesn't preclude his ability to do certain tasks"); *Wilder v. Apfel,* 153 F.3d 799, 802 (7th Cir. 1998) (finding that, when an expert's testimony was "dropped out as . . . contaminated by legal confusion," the ALJ was left to rely on a treating physician's testimony concerning the same issue). Therefore, PE Biscardi's misunderstanding was inconsequential; standing alone, the Court would not remand on this basis. *Id.*

In conclusion, the Court finds that, upon remand, the ALJ should explain why he rejected the opinions of Dr. Patel, Dr. Caldarelli, and Dr. Rabinowitz. The Court further concludes that the ALJ properly explained why he credited PE Biscardi's assessment of Plaintiff's condition over Dr. Hovsepian's opinion, and that Dr. Cochran's conclusions adequately supported the ALJ's findings.

## CONCLUSION

For the reasons set forth above, the Court finds that further fact-finding is necessary to determine whether the jobs identified at Step Five are consistent with the DOT. Accordingly, the Commissioner's Motion for Summary Judgment is Denied and the Plaintiff's Motion for Summary Judgment is Granted. This case is remanded to the Commissioner for further action consistent with this Opinion.

Dated: January 10, 2008       E N T E R:


ARLANDER KEYS
United States Magistrate Judge